[Civ. No. 15506. First Dist., Div. One. Sept. 25, 1953.]

ALFRED R. BETTANCOURT et al., Appellants, v. GILROY THEATRE COMPANY, INC. (a Corporation), Respondent.

Roland R. King for Appellants.

B. E. Kragen, Lionel B. Benas, Edward M. Fellows and Edward Stern for Respondent.

WOOD (Fred B.), J.—Plaintiffs Alfred R. Bettancourt and Clara H. Bettancourt have appealed from a judgment of nonsuit in their action against Gilroy Theatre Company, Inc., for damages for failure of the defendant to perform an alleged contract "to erect a *First class Theatre*" on certain described real property in the city of Gilroy, California.

The contract in question, dated February 12, 1947, was written upon a printed form designated "Receipt and Agreement for Sale of Real Property." Plaintiffs therein agreed to sell and defendant to buy a certain parcel of land, situate on the westerly side of Monterey Street, between Third and Fourth Streets, in the city of Gilroy, with a frontage of 80.2 feet and a depth of approximately 140 feet.

The stated monetary consideration was $16,842, taxes to be prorated as of the date of delivery of the deed. In addition, the agreement declared: "The buyers are to erect a *First class Theatre* on the above described premises as soon as materials, equipments and furnishings are available; at reasonable prices. None of the restrictions, easements, covenants, conditions and rights of way to which said property is subject shall be such as will prevent the use of the property for motion-picture theatre purposes."

About March 5, 1947, plaintiffs conveyed the land to defendant and defendant paid the $16,842.

August 2, 1950, without erecting the theater or any building, defendant conveyed this land to third parties, receiving $24,000 therefor.

The alleged damages consist of the enhancement in value which would have accrued to other properties of the plaintiffs (in the same block, on the same side of the street, with a frontage of about 214 feet) had the theater been built on the property sold to defendant.

The questions presented upon this appeal are these: (1) In respect to the erection of a first class motion picture theater, is the agreement sufficiently definite and certain to create and impose a contractual obligation upon the defendant; (2) does

section 1624 of the Civil Code apply and render invalid the purported obligation to erect a theater; (3) did the obligation to erect a theater ever mature; i.e., did materials, equipment and furnishings become available at reasonable prices?

(1) *In respect to the erection of a first class motion picture theater, is the agreement sufficiently definite and certain to create and impose a contractual obligation upon the defendant?*

This question is pointed up by certain observations of the trial judge (made when granting defendant's motion for nonsuit and denying its motion for dismissal of the action), especially these: ". . . the courts can not bring themselves to say . . . that the courts are warranted or even are permitted to write a new contract and to define what in this case would be a first-class theater," that even if the court were to consider the testimony as to what a first class theater would be (evidence introduced over the objection that its admission would violate the parol evidence rule) "I do not believe the Court would . . . be warranted in trying to rewrite the contract for the parties . . . based upon the ambiguity that is in the contract, namely, the ambiguity which arises where . . . the defendant says he will construct a first-class theater" (citing *Ellis* v. *Klaff*, 96 Cal.App.2d 471 [216 P.2d 15], and *Hart* v. *Georgia Railroad Co.* (1897), 101 Ga. 188 [28 S.E. 637]), and "the ruling of a non-suit, then, will present all possible questions of law."

Plaintiffs' position is that material terms were not omitted from the agreement, that plaintiffs' evidence was directed to showing that the language of the agreement was not indefinite (language which was understood by all concerned), and that there is involved no variance from or addition to the material terms of a written agreement.

In considering this question we must bear in mind that "The law leans against the destruction of contracts because of uncertainty and favors an interpretation which will carry into effect the reasonable intention of the parties if it can be ascertained. (*McIllmoil* v. *Frawley Motor Co.*, 190 Cal. 546, 549 [213 P. 971]; *Sutliff* v. *Seidenberg, Stiefel & Co.*, 132 Cal. 63, 65 [64 P. 131, 469]; *Roy* v. *Salisbury*, 21 Cal.2d 176, 184 [130 P.2d 706]; *Meyers* v. *Nolan*, 18 Cal.App. 2d 319, 322 [63 P.2d 1216].) The description of the subject matter of an agreement may be indefinite but if it is capable of being identified and rendered definite and certain by evidence *aliunde*, the contract is enforceable. (*McIllmoil* v.

*Frawley Motor Co., supra; Mebius & Drescher Co.* v. *Mills,*
150 Cal. 229, 236 [88 P. 917] ; *Pease* v. *Lindsey,* 129 Cal.App.
408, 410 [18 P.2d 717].) That is certain which can be made
certain. (Civ. Code, § 3538.)'' (*Avalon Products, Inc.* v.
*Lentini,* 98 Cal.App.2d 177, 179 [219 P.2d 485] ; hearing by
Supreme Court denied. See, also, Civ. Code, §§ 1643, 1647
and 3541; Code Civ. Proc., §§ 1859 and 1860; Corbin on Con-
tracts, § 95, p. 288 at 290-295.)

 The questioned testimony was that of several witnesses,
including that of plaintiff Alfred Bettancourt. He said that
''first-class theatre'' as used in the agreement meant to him
something better than the Strand Theater in Gilroy; it would
mean a new building; to comply with the fire ordinance, it
would have to be of concrete or cement blocks, something
that would pass the fire law; it would be a nice building; pre-
sumably some stores would go along with it; it would be
modern, but he did not have any particular design in mind;
a building that would cover the lot. . He never saw any plans
for the building. When a real estate agent first asked Bettan-
court if he would sell this property he was not much in-
terested, he had in mind to develop the property himself;
but when told the buyer wanted it for a theater site he be-
came interested; a nice theater building there would enhance
the value of the rest of his properties; he could see that a
theater building going up there would ''make'' that end of
town, would improve all those properties between Third and
Fourth Streets.

James B. Lima, defendant's vice-president (called by plain-
tiffs under section 2055 of the Code of Civil Procedure), testi-
fied that in the latter part of 1946 he was looking for a theater
site on Monterey Street in Gilroy; the defendant was operat-
ing and still operates the Strand Theater in that city; his
search culminated in the agreement here involved, and ac-
quisition of the land described in the agreement. He said that
when he executed the agreement a ''first-class theatre'' meant
to him ''to erect a comfortable theater in Gilroy, according
to the code required to build a theater in Gilroy. They have
the city ordinance to build a theater with certain classifica-
tions and to make them comfortable as possible.'' He had
plans prepared within a few months after purchase of this
property, for a theater along the entire frontage of the lot,
with two stores in front, one on either side of the entrance
to the theater; there was nothing unusual about it, ''just a nice
building, as reasonable as we could get by according to the

code"; steel construction, reinforced concrete; the plans called for about 900 seats; the Strand Theater has 800 seats.

Ralph Wyckoff, architect, examined these plans. He considered them preliminary drawings such as an architect would make for an owner who would like some idea of whether the property is suitable for the structure and to get a general idea of the size and the number of seats he probably could get in a building on that space. He viewed those drawings "as probably complying with the contract to the extent that they would be a first-class theater for Gilroy."

Three witnesses, in addition to Wyckoff and Bettancourt, testified concerning the increase in value which would have accrued to the remaining Bettancourt properties if a first class theater had been built upon the property sold to defendant. None of these three was asked to describe what a first class motion picture theater in Gilroy meant to him, but none of them seemed to entertain any doubt or encounter any difficulty in using and applying that term in estimating the amount of damages.

From this evidence it appears that the expression "first-class theatre" for the exhibition of motion pictures was sufficiently definite and certain to enable the defendant to know what it had undertaken to do and, if defendant had built a theater, for a court to determine whether or not it represented a fair and reasonable performance of the contract.

Similar questions of definiteness and certainty have arisen, principally it would seem, in suits for specific performance of agreements to erect structures upon land owned by the defendant or under his control, structures deemed of benefit to neighboring lands of the plaintiff. Under such circumstances the plaintiff, having no access to the land, is not in a position to build the structure and recoup the cost thereof from the defendant.

*Lawrence* v. *Saratoga Lake R. Co.* (1885), 36 Hun. (N.Y.) 467, was such a case. A landowner agreed in writing to convey a railroad right of way across his land upon condition that the grantee erect at or near a certain spring ". . . a neat and tasteful station building for the accommodation of passengers to and from said spring, which shall be a regular station of the road, and all regular trains shall stop at said station . . ." (P. 469.) The railroad was afterwards built along the indicated line, with some deviations consented to by the grantor who added as a condition that certain bridges be constructed and maintained over the railroad. The railroad company

failed to erect the station house and refused to build two of the bridges.

The trial court found the agreement so indefinite and uncertain that the court could not direct specific performance. The reviewing court, reversing the judgment,* said, concerning the element of certainty and definiteness: "One of the three things was to construct and maintain a bridge over the railroad at the old highway at Lawrence's east line. We see nothing indefinite in this. There can be no difficulty in determining where the highway is. To insist that the railroad cannot build a bridge because they do not know whether it should be of wood, or iron, or gold, or platinum, is a poor excuse. A bridge suitable for a highway crossing is what is intended, and that is definite enough. (*Jones* v. *Seligman,* 81 N.Y. 190.) If defendant were willing to perform its agreement, it would have no difficulty in understanding its obligations." (P. 472.) Concerning another bridge, the court said: "But the defendant's objection is that the size and material are not specified. We do not see why proof might not be given as to the size and material suitable and proper for bridges at those places, and for the purposes indicated. It is often the case that proof of surrounding circumstances is needed to explain a contract." (Pp. 472-473.) Concerning the station, the court observed: "The third thing to be done by defendant was to erect at or near Excelsior Spring a neat and tasteful station building for the accommodation of passengers to and from said spring, which should be a regular station, and to have all regular trains stop at said station; the name to be Excelsior Spring Station. The same argument in regard to this building is urged by defendant, viz: that the words 'a neat and tasteful station building for the accommodation of passengers to and from said spring,' are too indefinite. But it is found as a fact that the defendant has built station buildings for similar purposes; one about 4,000 feet east and the other about the same distance west of the spring. Would there be any difficulty on defendant's part

---

*The reviewing court, while holding this a proper case for specific performance, deemed it improper to modify the judgment to accord that remedy, in view of the state of the record. Further evidence might be needed. "This case comes to us only on the findings of the court, and the plaintiffs ask that we modify the judgment by giving the relief to which they are entitled. We do not think that this can properly be done. Evidence may be needed at the trial to explain the circumstances surrounding the agreement; the time needed for the construction of the bridges and station; the exact place as shown on the map, etc." (36 Hun. (N.Y.), at p. 477.)

in building one at the plaintiff's spring? And would it not be easy for a court or a jury to decide whether a building was a fair and reasonable performance of this agreement, or was a fraud and an evasion?" (P. 473.)

In *Lane* v. *Pacific & I. N. Ry. Co.* (1902), 8 Idaho 230 [67 P. 656, 658], an agreement by a railway company to construct certain underground crossings, wooden culverts, fences and a switch or side track was found sufficiently definite and certain for the remedy of specific performance to be available. In *Molyneux* v. *Richard* (1906), L.R. 1 Ch. 34, 41-42, specific performance was deemed proper, of an agreement by a lessee to build seven dwelling houses similar to dwelling houses already erected on a certain street nearby, even though the latter were not all exactly alike. See, also, the cases collected in the notes in 15 L.R.A.N.S. 594; 16 L.R.A.N.S. 307; L.R.A 1916F. 691; 14 Ann.Cas. 478; and 164 A.L.R. 802-840, especially 808, 810-815, and 834-837. In *Herzog* v. *Atchison, T. & S. F. R. Co.*, 153 Cal. 496 [95 P. 898, 17 L.R.A.N.S. 428]; the court denied specific performance of an agreement of a railway company to establish and maintain a permanent station for passengers and freight. The complaint failed to show that the agreement as originally made was fair and just as between the parties or that its enforcement would add to the convenience of the plaintiffs or to the value of any property owned by them or that damages would not afford an adequate remedy. The court did say that similar contracts had been specifically enforced (citing, among other cases, *Lawrence* v. *Saratoga Lake R. Co.*, *supra*, (1885), 36 Hun. (N.Y.) 467), and that: "Where such contracts are limited to the creation of a right to a certain station or train service at given points, without in any way making the right exclusive or infringing upon the company's obligation to furnish proper service at any other place where it may be needed, we are not prepared to hold that their enforcement would necessarily be violative of public policy." (P. 500 of 153 Cal.)

In *Fraley* v. *Bentley* (1874), 1 Dak. 25 [46 N.W. 506], defendant when purchasing a portion of plaintiff's land agreed to erect a "steam saw-mill" on that portion but failed to do so. Plaintiff sued for specific performance or damages and was awarded damages. Concerning the element of certainty the reviewing court said: "It is with much zeal argued that there was no description or kind of mill agreed upon, and no time that the mill should remain on the land. We

need only apply a good common-sense rule to settle this question. A good steam saw-mill, as ordinarily understood, would be a mill capable of doing such work, and to such amount, as is ordinarily done by good mills; the words 'good mill' have a reasonably definite meaning." (P. 508.) In *St. Louis I. M. & S. Ry. Co.* v. *Berry* (1908), 86 Ark. 309 [110 S.W. 1049], damages were awarded against a railway company for failure to perform its agreement to erect a "siding and depot." Failure to designate the exact location and the kind of a depot to be built did not render the contract too indefinite to be carried out. "The stipulation of the deed under consideration contains no restrictions, and, being general in its character, could never become a source of embarrassment to the railroad company in the future. Appellee had a right to assume that it would erect a depot in keeping with other depots on its line of road and commensurate with the necessities of the public, and that it would be located at the point deemed most advantageous to the railroad, having reference to the topography of the ground as well as the convenience of the public. These were matters properly left to the judgment of the railroad company." (Pp. 1050-1051 of 110 S.W.) In *Atlanta & W. P. R. Co.* v. *Camp* (1908), 130 Ga. 1 [60 S.E. 177, 124 Am.St.Rep. 151, 14 Ann.Cas. 439, 15 L.R.A. N.S. 594], the court affirmed a judgment for the plaintiff in an action for damages for failure of the railway company to perform its agreement to establish a station at a point near plaintiff's property. In *Alderton* v. *Williams* (1905), 139 Mich. 296 [102 N.W. 753, 754-755], an agreement by the defendant to convert his heading mill into a stavemill, to carry on the business of manufacturing and selling staves, was deemed sufficiently definite and certain to constitute a valid contract.

Thus, it appears, there is ample authority for our holding that, under the circumstances of this case, the expression "First class Theatre" for the display of motion pictures was sufficiently definite and certain to form the basis for a contractual obligation, especially in an action for damages as distinguished from a suit for specific performance. ■ "It is settled that ' "a greater amount or degree of certainty is required in the terms of an agreement which is to be specifically executed in equity than is necessary in a contract which is the basis of an action at law for damages . . ." ' " (*Pascoe* v. *Morrison*, 219 Cal. 54, 58 [25 P.2d 9].) Ours is an action

for damages. Defendant lost the capacity to perform when it sold the theater site in 1950.

Defendant relies upon a number of cases which we have examined and do not consider applicable here. We mention some of them. *Ellis* v. *Klaff*, 96 Cal.App.2d 471 [216 P.2d 15], was an action for rent and damages for breach of a lessee's covenant to improve the premises " '. . . by the construction of a building or buildings as soon as building conditions reasonably shall permit . . . any building or structure constructed by the lessee shall comply strictly with the Building Code of the city of Buenaventura.' " (P. 473.) This clause was deemed too indefinite to create a contractual obligation and, we think, appropriately so. Neither the kind nor the number of buildings, nor the use or uses to which they respectively were to be put were specified in the writing. More like the agreement involved in our case was the joint venture agreement in *Hillman* v. *Hillman Land Co.*, 81 Cal. App.2d 174, 185 [183 P.2d 730], in which it was alleged that the parties agreed they would "construct about 30 three-bedroom houses" on a certain tract of land. In response to the contention that the failure to state the exact number of houses rendered the agreement too indefinite, the court said: "It is obvious that the number to be erected would depend upon the building and zoning laws and regulations and upon the portion of the property that would be required to be dedicated for street purposes. When these conditions became definitely known more or fewer than 30 dwellings might have been permissible. Such objections are hyper-technical and are without merit." *Cannaday* v. *Martin* (Tex. Civ.App., 1936), 98 S.W.2d 1009, involved an agreement, partly written and partly oral, for the construction of a building. The written part, which merely described it as a "brick building," was deemed too vague and indefinite. The oral part apparently would have supplied sufficient detail but the statute of limitations had run. *Cincinnati Underwriters Agency Co.* v. *Thomas J. Emery Memorial*, 88 F.2d 506, involved the covenant of a lessee to erect a building of fireproof construction, the portion thereof erected on the demised premises to cost not less than $100,000. In holding the description too indefinite, the court said: ". . . there is no description of the building to be constructed; nothing is said as to whether the construction was to consist of a building placed entirely upon the property of the appellee or only partly on

374

its property, nothing about its height, frontage, or the materials to be used." (P. 508.) (Nor, we may add, was there any frame of reference such as, in our case, the Gilroy building ordinance and the Strand Theater, operated by the defendant.) An attempt was unsuccessfully made to show by parol that the parties intended a monumental building at least 10 stories high covering in part the demised premises and in part adjacent property. The written covenant bore no similarity to the agreement in our case. *Dusold* v. *Johnston,* 101 Cal.App.2d Supp. 907 [225 P.2d 536], involved a memorandum of a lease for a term of more than one year which was "totally lacking in identification of the term, its beginning and ending, or of the rental and the time and places of its payment." (P. 909.) In *Hart* v. *Georgia R. Co.* (1897), 101 Ga. 188 [28 S.E. 637], the court deemed too indefinite an agreement on the part of the plaintiff to erect " 'a permanent and first-class hotel for the accommodation of the travelling public, and maintain the same in a first-class manner,' " and on the part of the defendant railway company "by patronage of its road" to "maintain and support the same." Plaintiff alleged she did erect and maintain such a hotel, but that defendant had discontinued stopping its trains for meals. She sought damages. Said the court in part: "What is a first-class hotel? How is a hotel maintained in a first-class manner? What is the patronage of a road running trains day and night at a given point?" (P. 637.) No authorities were cited. It does not appear that any of the railway depot cases, such as *Lawrence* v. *Saratoga Lake R. Co.* (1885), *supra,* 36 Hun. (N.Y.) 467, or the Georgia case of *Georgia Southern R.* v. *Reeves* (1880), 64 Ga. 492, were brought to the attention of the court. In 1908 the Georgia Supreme Court deemed valid a contract of a railway company to establish and maintain a station at or near a certain settler's land, subject, of course, to the duty of the railroad to serve the public and, if continued maintenance of the station should interfere with the performance of that duty, further maintenance of the station could and should be discontinued. The court did not indicate that it entertained any doubt on the ground of definiteness or certainty, nor did it cite the Hart case. (*Atlanta & W.P. R. Co.* v. *Camp,* 130 Ga. 1 [60 S.E. 177, 124 Am.St.Rep. 151, 14 Ann.Cas. 439, 15 L.R.A.N.S. 594].)

(2) *Does section 1624 of the Civil Code apply and render invalid the purported obligation to erect a theater?*

 Section 1624 of the Civil Code applies to the agree-

ment here involved. This statute declares invalid "an agreement . . . for the sale of real property": unless "the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged, or by his agent." The agreement here involved is in writing and is subscribed by the defendant.

This writing satisfied the requirements of section 1624. It contains, as we have seen, the essential terms of the contract. The evidence considered above in relation to the parol evidence rule does not supply or vary any of those terms. It merely serves to identify the subject matter from the written description and assists in interpreting the expressed intentions of the parties in the light of circumstances at the time of execution of the contract. (See *United Truckmen, Inc.* v. *Lorentz,* 114 Cal.App.2d 26, 34 [249 P.2d 352], and authorities there cited.)

(3) *Did the obligation to erect a theater ever mature? Did materials, equipment and furnishings become available at reasonable prices?*

Defendant agreed to erect the theater "as soon as materials, equipment and furnishings are available; at reasonable prices." Defendant claims the evidence is not sufficient to support a finding that materials, equipment and furnishings for the erection of a first class motion picture theater became available at reasonable prices.

An expert witness, Ralph Wyckoff, an architect of 30 years' experience, familiar with building prices and costs, testified that building materials and equipment started to become available in 1947 (the agreement in suit was executed in February, 1947) ; that in the middle of that year he was building almost any type and getting anything he wanted; thereafter they were coming along in good shape; several large furniture factories were making theater seats by the thousands in 1947. He did not have personal knowledge concerning the availability of motion picture equipment at that time. However, the fact that a drive-in motion picture theater was built near Gilroy in 1949 (purchased by defendant in April, 1950) would support an inference that motion picture equipment was available.

Concerning "reasonable prices," Wyckoff testified there was no rise in theater building costs during 1947; they had leveled off about then; 1947 and 1948 were about the same; there was a little drop in 1949 and 1950, until we became engaged in war in Korea. This testimony would furnish sufficient

support for a finding that motion picture theater materials, equipment and furnishings could be obtained at reasonable prices.

Defendant challenges such a conclusion upon the ground that Wyckoff spoke merely of market prices, claiming that market prices furnish no evidence of reasonable prices. That argument ignores the fundamental notion that when goods are available in the market place, the prices which there obtain are normally a convenient and acceptable indication of their reasonableness.

The availability of goods at reasonable prices presented a question of fact. The testimony that they had become available bore upon one aspect of the question. The testimony that prices had declined and were on the decline bore upon the other. It was inferable that there was a market and, in the absence of evidence to the contrary, that the prices which obtained in the market were reasonable. In applying the expression "reasonable prices" in a contract for the purchase of malt liquors, the court in *Courage & Co. Limited* v. *Carpenter* (1910), 1 Chan.Div. 262, 268, said: "It seems to me that I cannot hold that the prices adopted practically by the whole of the London brewers, and assented to by practically the whole of the licensed victuallers trading in London, are unreasonable prices." In respect to the sale of a certain kind of paper, for which there was a uniform market price among paper houses, the court in *Coleman* v. *Modern Miller Pub. Co.,* (Mo.App. 1919), 213 S.W. 172, held that a price slightly in excess of the market price was reasonable where the seller extended unlimited credit to the buyer (as distinguished from cash or cash within 30 days) and the buyer did not pay its bills regularly. We conclude that market prices are a fair indication of reasonable prices in the absence of any evidence to the contrary.

The judgment appealed from is reversed.

Peters, P. J., and Bray, J., concurred.