[Civ. No. 20540. Fourth Dist., Div. Two. Oct. 12, 1979.]

LARWIN-SOUTHERN CALIFORNIA, INC.,
Plaintiff and Appellant, v.
JGB INVESTMENT COMPANY, INC., et al.,
Defendants and Respondents.

**COUNSEL**

Irell & Manella, Robert L. Winslow and Terrance Fallon-McKnight for Plaintiff and Appellant.

Redwine & Sherrill and Ronald J. Kohut for Defendants and Respondents.

**OPINION**

**McDANIEL, J.**—Larwin-Southern California, Inc. (plaintiff) filed an action seeking declaratory relief and specific performance against JGB Investment Company, Inc. and A. C. Nejedly (defendants). The controversy leading to this litigation arose when defendants contracted in writing[1] to sell to plaintiff a certain parcel of land but then failed to go through with the transaction. As a consequence of that failure, plaintiff alleged in its complaint that defendants had materially breached the contract and then demanded the equitable relief noted above.

After plaintiff filed its complaint, defendants demurred, and such demurrer was sustained without leave to amend. The trial court, in sustaining the demurrer, ruled that the contract was unenforceable because it was defective in two respects: (1) the contract lacked mutuality of obligation; and (2) its material terms were ambiguous and uncertain. Plaintiff appealed from the judgment of dismissal. For the reasons explained below, we reverse the judgment.

---

[1]The written contract is embodied in a letter, dated June 3, 1977, addressed to defendant A. C. Nejedly and signed by Monty Polson, senior vice president of plaintiff.

FACTS

Summarizing the key allegations of the complaint, in early June of 1977, plaintiff as vendee and defendants as vendors[2] entered into a written contract for the sale of real property located in Riverside County. This contract in its essential terms provided for the purchase and sale of 79 acres of land to be developed as a residential subdivision.

Under the terms of this agreement the manner in which the purchase price was to be figured depended on prospective events. The contract in this respect recited, "[t]he purchase price shall be computed at $13,750.00 per fully improved lot, less the cost to fully improve each lot ('Improvement Costs') to conform to the requirements of the governing agency(s). Buyer and Seller's engineers to concur on the 'Improvement Costs' per lot within 45 days after approval of Seller's tentative map by the governing agency(s)." The contract then went on to provide that "[i]f a conflict should arise, bids from qualified subcontractors shall be used. The purchase price shall be determined by subtracting the agreed upon 'Improvement Costs' from the price of $13,750.00 per lot, multiplied by the number of buildable lots on Seller's tentative map as approved by the governing agency(s)."

Otherwise the contract contained several contingencies. Paragraph 4 of the letter agreement reads:

"4. Buyer's obligation to purchase the property and the closing of the escrow contemplated hereby are subject to the following contingencies:

"(a) Buyer's approval of the preliminary title report, which shall be accomplished in the manner shown on Appendix 'A' attached hereto and made a part hereof.

"(b) Buyer's approval of its engineering report as to soil conditions, dirt balance, drainage, and utility requirements and its economic feasibility study for a residential development and approval of Seller's tentative map with conditions satisfactory to Buyer, for no less than 73 residential lots.

---

[2]Defendant A. C. Nejedly was the original vendor under the contract of sale. After escrow was opened, defendant JGB Investment Company, Inc., was substituted in lieu of defendant Nejedly as the vendor.

"Buyer's approval or disapproval of paragraph (b) shall be given within 45 days from the date of approval of Seller's tentative map by the governing agency(s).

"Buyer's approvals provided for in this paragraph may be given or withheld in its sole judgment and discretion, and the lack of approvals shall be deemed to be disapprovals. All approvals shall be in writing.

"If Buyer fails to approve any item listed above within the time provided therein, then the escrow, at Buyer's option, shall automatically terminate; but Seller shall be at no expense and Buyer, upon payment of escrow and title expenses, shall be relieved of all obligation in this transaction. In the event of such termination, the escrow shall return all papers and funds to the party depositing same."

The agreement also contained a provision which recited, "[i]f governing agencies preclude the acceptance of less than 73 lots by a change in the present zoning criteria then seller shall give buyer the right to renegotiate the purchase price per lot. If improvement costs exceed $4,500 per lot due to a change of present zoning criteria the same right shall be granted."

The complaint also alleged the exchange of certain correspondence, copies of which were attached to the complaint as exhibits. One such letter was from plaintiff to the escrow holder and stated:

"As we previously advised you, Seller's tentative map was approved by the governing agency on February 7, 1978.

"Pursuant to paragraph 1 of the above numbered escrow, we have determined that the 'Improvement Costs' are $11,608.00 per lot. The amount of lots, as shown on Seller's approved Tentative Map number 10626 is 74. Therefore, the purchase price is as follows: $13,750.00 less $11,608.00 or $2,142.00 per lot times 74 lots, which equals $158,508.00.

"Buyer hereby approves paragraph 4(b) of said escrow instructions, and requests that you schedule close of escrow on April 24, 1978, at which time we will deposit a total of $129,254.00 cash plus appropriate expenses into the escrow."

The other was directed to plaintiff by an attorney representing defendants and as here pertinent stated,

"Your unilateral determination of improvement costs is rejected as not being in compliance with either Paragraph 1 of the proposal or with Exhibit B thereto, which in and of itself modified Paragraphs 1 and 5 of Larwin's proposal.

"Seller's engineers will have their cost estimates completed in about two weeks. These estimates, based upon Paragraph 5 as amended by Exhibit B should include *only* those items imposed by the local agencies. If these costs exceed $4,500.00 per lot, the sales price will either be renegotiated or escrow cancelled, as per Exhibit B's modification of Paragraph 1.

"It is conceeded [*sic*] that Exhibit B could have been more artfully drafted; however, when combined with oral communications I am informed of between both sides at the time it was prepared and executed its intent is clear. If the tentative map allowed less than 73 houses, Larwin could renegotiate. If the *necessary* lot improvement costs imposed by the local agencies exceeded $4,500.00 per lot, the Seller could renegotiate. If either renegotiation did not result in a mutually agreeable 'deal', either could cancel.

"By copy of this letter to T.I., we are informing them that the Seller does *not* agree with your 'cost' estimate and hence they are not to close escrow based upon your statements in the letter of March 22, 1978, even if they were in a position to do so."

After the contract was entered into, a tentative subdivision map was prepared and filed with the appropriate local government agency which approved it. Plaintiff, after learning of such approval submitted to defendants the estimated improvement costs as prepared by plaintiff's engineer, indicating that it was ready, under the terms of the agreement, to negotiate the final improvement costs factor.[3]

Notwithstanding, the defendants thereafter failed and refused to negotiate such factor. In justification of such refusal, defendants asserted

---

[3] Plaintiff, in its complaint, stated that the median bid received would be used in calculating the per lot purchase price. On appeal, plaintiff explains that reference to a median bid was inadvertent error and, in an amended complaint, had it been permitted, proper reference to use of the lowest bid would be made.

that if their engineer's estimate of improvement costs exceeded $4,500 per lot they could unilaterally demand renegotiation of the terms of the agreement between the parties and, if mutual agreement could not be reached regarding improvement costs, cancel said agreement. For these reasons defendants refused to proceed.

## ISSUES AND DISCUSSION

As previously indicated, defendants advanced two substantive legal arguments in support of their demurrer. First, defendants contended that the contract lacked mutuality of obligation because plaintiff's obligation to perform was conditioned on various satisfaction clauses. Second, defendants urged that various material terms of the contract, discussed more fully below, were fatally uncertain. The trial court's order sustaining defendants' demurrer without leave to amend expressly adopted defendants' reasoning. That order reads in part: "IT IS ORDERED that the demurrer to the complaint on the grounds of failure to state facts sufficient to constitute a cause of action in that material portions of the alleged contract are indefinite and uncertain...and that the alleged contract is illusory...be...sustained without leave to amend."

Plaintiff advances the following contentions in seeking reversal of the judgment of dismissal: (1) the trial court abused its discretion in sustaining defendants' demurrer without leave to amend because a reasonable possibility existed that plaintiff could cure any technical or substantive defects in the original complaint by means of an amended complaint; (2) the trial court erred in holding that the contract lacked mutuality of obligation; and (3) the trial court erred in ruling that the contract was too indefinite to enforce.

As explained below, it is our view that a reasonable possibility existed that plaintiff could cure the defects, arguably present in its complaint, if given the opportunity to amend. We therefore hold that the trial court abused its discretion in sustaining defendants' demurrer without leave to amend. Accordingly, we reverse the judgment of dismissal.

Additionally, for purposes of guidance to the parties and trial court, assuming plaintiff files an amended complaint and this litigation continues, we opine that the presence of a satisfaction clause in the contract did not act to nullify mutuality of obligation. Moreover, in our view, certain material terms of the contract which were characterized by the

trial court as fatally uncertain, are sufficiently certain to enable the contract's enforcement, or at least reasonably susceptible of having their intendments clarified in an amended complaint.

## I

The trial court sustained defendants' demurrer without offering plaintiff an opportunity to amend its complaint. The legal standards used in assessing, on appellate review, the propriety of a trial court's order sustaining a demurrer without granting leave to amend have been articulated as follows: "An order sustaining a demurrer without leave to amend 'ordinarily constitutes an abuse of discretion, if there is a *reasonable possibility* that the defect can be cured by amendment.' [Citation.] Liberality in permitting amendment is the rule, not only where a complaint is defective as to form but also where it is deficient in substance, *if a fair prior opportunity to correct the substantive defect has not been given.* [Citations.]" (*Greenberg* v. *Equitable Life Assur. Society* (1973) 34 Cal.App.3d 994, 998 [110 Cal.Rptr. 470], italics added.) Of course, "the plaintiff has not had a fair opportunity ...[to cure a substantive defect]...where the demurrer [is] sustained to [its] first complaint.' [Citation.]" (*Coffman* v. *Kennedy* (1977) 74 Cal.App.3d 28, 37 [141 Cal.Rptr. 267]. See also *Rodrigues* v. *Campbell Industries* (1978) 87 Cal.App.3d 494, 501 [151 Cal.Rptr. 90].)

The case at bench, like many breach of contract cases, presents numerous issues concerning the proper characterization and interpretation of the parties' intent in executing the agreement. The trial court, in sustaining defendants' demurrer without offering plaintiff leave to amend, apparently was of the view the contract's material terms were not reasonably susceptible of clarification in any possible amended complaint. In this stand, the trial court erred because it failed to recognize that extrinsic circumstances might be available for pleading which would indicate the parties' intent. It ignored as well custom and usage within the trade which may properly be used in clarifying what, on the face of a contract, appears to be an ambiguity. (See, e.g. *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 224-225 [65 Cal.Rptr. 545, 436 P.2d 561].) We acknowledge, after plaintiff is given an opportunity to clarify the contract's terms with additional allegations of extrinsic facts, that if those terms yet remain uncertain, then the contract would be unenforceable as a matter of law. Obviously, however, when a demurrer is sustained to a plaintiff's original complaint, as occurred in the case at bench, and a judgment of dismissal entered, a fair opportunity (see *Coffman* v. *Ken-*

*nedy, supra*, 74 Cal.App.3d 28, 37) to allege extrinsic events is unreasonably foreclosed. On this basis, therefore, the trial court erred in not affording plaintiff an opportunity to amend its complaint after sustaining defendants' demurrer.

■ Moreover, a second basis supports our conclusion that the trial court abused its discretion in failing to give plaintiff an opportunity to amend its complaint. The degree of certainty of the material terms of a contract required for that contract's enforcement necessarily varies dependent upon the type of relief sought. ■ If a plaintiff demands the equitable remedy of specific performance, rather than the traditional legal remedy of damages, the material terms of a contract must be significantly more certain. (See, e.g., *Bettancourt* v. *Gilroy Theatre Co., Inc.* (1953) 120 Cal.App.2d 364, 372 [261 P.2d 351]; *Cappelmann* v. *Young* (1946) 73 Cal.App.2d 49, 54 [165 P.2d 950].) In plaintiff's original complaint its prayer demanded only equitable relief. Therefore, the trial court was required to peruse the material terms of the contract in a more exacting manner. ■ Because a claim for monetary damages was not included in the prayer, the trial court never reached the question of whether the contract was enforceable at law, rather than in equity. Plaintiff argues on appeal that if given an opportunity to amend, it would not only clarify the contract's alleged ambiguity, but also amend the complaint's prayer to include allegations of and a prayer for damages, thus permitting less exacting scrutiny of the contract's terms. In our view, in light of the fairness standard enunciated above, plaintiff should have been afforded the opportunity to include a legal claim for damages in its complaint, thus requiring the trial court to consider the enforceability of the contract at law as well as in equity.

Accordingly, based on the two grounds just discussed, we hold that the trial court abused its discretion in sustaining defendant's demurrer without affording plaintiff leave to amend. The judgment must therefore be reversed.

The result of such holding would normally make unnecessary further consideration of the other issues raised on this appeal, i.e., whether the contract contains mutuality of obligation and whether its material terms are sufficiently certain to be enforced. However, because a reasonable likelihood exists that defendants will demurrer to plaintiff's amended complaint urging similar grounds for dismissal, we would be acting improvidently if we failed to consider those issues for purposes of

future judicial guidance. We therefore offer the following comments on those issues.

## II

█ In a bilateral contract, the promisor and promisee must exchange promises representing binding legal obligations to render the contract enforceable. The requirement that binding legal obligations underlie a contract is generally referred to as the doctrine of mutuality of obligation. In essence, mutuality of obligation must exist where the exchange of promises between promisor and promisee is meant to represent the contract's consideration. (See, e.g., 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 170, p. 162.) █ Defendants argue that plaintiff's promise to purchase is illusory because it is conditioned by satisfaction clauses permitting plaintiff to perform or refuse to perform at its own unrestricted pleasure. As a consequence, defendants contend that the contract lacks mutuality of obligation and is therefore unenforceable.

The satisfaction clauses contained in the contract have already been noted, but are repeated here for ease of reference.

"4. Buyer's obligation to purchase the property and the closing of the escrow contemplated hereby are subject to the following contingencies:

"(a) Buyer's approval of the preliminary title report, which shall be accomplished in the manner shown on Appendix 'A' attached hereto and made a part hereof.

"(b) Buyer's approval of its engineering report as to soil conditions, dirt balance, drainage, and utility requirements and its economic feasibility study for a residential development and approval of Seller's tentative map with conditions satisfactory to Buyer, for no less than 73 residential lots.

"Buyer's approval or disapproval of paragraph (b) shall be given within 45 days from the date of approval of Seller's tentative map by the governing agency(s).

"Buyer's approvals provided for in this paragraph may be given or withheld in its sole judgment and discretion, and the lack of approvals shall be deemed to be disapprovals. All approvals shall be in writing.

"If Buyer fails to approve any item listed above within the time provided therein, then the escrow, at Buyer's option, shall automatically terminate; but Seller shall be at no expense and Buyer, upon payment of escrow and title expenses, shall be relieved of all obligation in this transaction. In the event of such termination, the escrow shall return all papers and funds to the party depositing same."

As can be readily observed, the above provision conditioned, in certain respects, plaintiff's obligation to purchase the property. Specifically, for example, paragraph (b) conditions plaintiff's obligation to purchase on its approval of an engineering report, an economic feasibility study, and defendants' tentative tract map. The facts, as gleaned from plaintiff's complaint, demonstrate, however, that, by the time of filing, plaintiff had approved the various reports just noted. Thus, the question of whether presence in the contract of the satisfaction clauses undermined mutuality of obligation had been rendered moot as the result of plaintiff's unqualified approval of those reports. Insofar as that portion of the contract was concerned, plaintiff had performed pursuant to its promise.

■ In any event, disregarding the fact that plaintiff had approved the various reports noted above, the presence of a satisfaction clause in a contract does not result in that contract's per se nullity. In *Mattei* v. *Hopper* (1958) 51 Cal.2d 119 [330 P.2d 625], the California Supreme Court expressly held that contracts containing satisfaction clauses are nonetheless enforceable. In that case, plaintiff, a real estate developer, entered into a written contract with defendant for the purchase and sale of a parcel of land. Plaintiff promised to pay $57,500 for defendant's property. Included in the terms of the contract was a satisfaction clause conditioning plaintiff's obligation to purchase the property on a bank's ability to obtain "'leases satisfactory to the purchaser [plaintiff].'" (*Id.* at p. 121.) After plaintiff made a $1,000 deposit, defendant notified plaintiff that she did not intend to sell the property. Plaintiff then sued defendant for breach of contract. After a trial to the court, a judgment was entered for defendant based on a finding that the contract was illusory and lacked mutuality of obligation because of the presence of the satisfaction clause noted above.

On appeal, the Supreme Court reversed the judgment. In reaching that result, the court reasoned that California courts recognize two tests in assessing the validity of satisfaction clauses. First, where commercial value or quality is in issue, an objective standard of reasonableness is applied in determining whether satisfaction is received. Second, if the question of whether satisfaction is received is based upon subjective factors, the party exercising that judgment is required to adhere to an implied duty of good faith. Moreover, in this latter context, the court explained *"that the promisor's duty to exercise his judgment in good faith is an adequate consideration to support the contract."* (*Id.* at p. 124, italics added.) In view of this rule, the Supreme Court held "that the contract...was neither illusory nor lacking in mutuality of obligation because the parties inserted a provision in their contract making plaintiff's performance dependent on his satisfaction with the leases to be obtained by him." (*Id.* at p. 126.)

Similarly, in *Rodriguez v. Barnett* (1959) 52 Cal.2d 154 [338 P.2d 907], the court affirmed a judgment for a plaintiff buyer in an action on a land sale contract. The buyer's obligation to purchase was conditioned on satisfaction with and approval of a subdivision map which had been submitted to the City of Riverside, subsequent to the city's final approval of the map. Plaintiff rejected the subdivision map as approved and requested the defendant-seller to return his deposit. Defendant refused. The court held that the "satisfaction clause" contained in that contract did not give the plaintiff a license to withdraw from the contract, thus making it unenforceable for lack of mutuality. The court noted: "From an examination of this instrument as a whole, it clearly appears that the plaintiffs were given the right to withdraw from further performance if they found themselves dissatisfied with the subdivision map proposed by the governmental authorities. They were not given a right to withdraw at their own unrestricted pleasure. There is nothing in the retention provisions which indicates that the right to retain the deposit was given to the defendant as consideration for allowing the condition of disapproval on plaintiffs' performance or as a payment for an option to withdraw. This agreement was clearly a bilateral one, the consideration for which was the mutual promises of the parties....[¶] The agreement was neither illusory nor lacking in mutuality of obligation merely because the parties thereto inserted a provision making the purchasers' performance dependent on their satisfaction with the subdivision map to be obtained by them. Contracts making the duty of performance of one of the parties conditional upon his 'satisfaction' are upheld on the theory that the expression of dissatis-

faction must be genuine and not arbitrary, and that an objective criterion,—good faith—controls the exercise of the right to determine satisfaction. [Citations.]" (*Id.* at p. 160.)

The Supreme Court also observed: "If a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if that can be done without violating the intention of the parties. [Citations.]" (*Id.* at p. 160.)

The Supreme Court's analyses and holdings in *Mattei* and *Rodriguez* are readily applicable to the case at bench. Plaintiff's right to approve or disapprove is a satisfaction clause of the subjective type. Accordingly, plaintiff, in deciding whether to exercise its approval or disapproval was required to do so within the parameters of the duty of good faith. That duty constitutes legally sufficient consideration to establish mutuality of obligation. Thus, defendants' contention that the presence of the satisfaction clauses in this contract render it unenforceable is without merit.

We note further that defendants have attempted to distinguish *Mattei* and *Rodriguez* by arguing that the portion of the contract reading "Buyer's approvals provided for in this paragraph may be given or withheld in its sole judgment and discretion" embellishes the contract with a satisfaction clause beyond the scope of the type of satisfaction clause approved by both cases. We disagree. Axiomatically, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in *good faith and in accordance with fair dealing.* [Citations.]" (*Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785, 49 A.L.R.2d 496], italics added; *Orange County Cable Communications Co.* v. *City of San Clemente* (1976) 59 Cal.App.3d 165, 172 [130 Cal.Rptr. 429].) Thus, despite the provision that plaintiff had "sole judgment and discretion" in deciding whether to approve or disapprove the various reports and studies in paragraph (b) that judgment and discretion must be exercised within the parameters of the implied contractual duty of good faith and fair dealing which, according to *Mattei* and *Rodriguez* constitute legally sufficient consideration. Accordingly, the parties' inclusion of the phrase "sole judgment and discretion" in the contract in this case does not in any respect diminish the presence of sufficient legal consideration and mutuality of obligation.

### III

In sustaining the defendants' demurrer, the trial court agreed with defendants' contention that various provisions of the contract were sufficiently uncertain to render the contract unenforceable. In real property transactions, "[t]he material factors to be ascertained from the written contract are the seller, the buyer, the price to be paid, the time and manner of payment, and the property to be transferred, describing it so it may be identified. [Citations.]" (*King* v. *Stanley* (1948) 32 Cal.2d 584, 589 [197 P.2d 321].) In determining whether those material factors are sufficiently certain "[t]he modern trend of the law is to favor the enforcement of contracts, to lean against their unenforceability because of uncertainty, and to carry out the intentions of the parties if this can feasibly be done. Neither law nor equity requires that every term and condition of an agreement be set forth in the contract. [Citations.] The usual and reasonable terms found in similar contracts can be looked to, unexpressed provisions of the contract may be inferred from the writing, external facts may be relied upon, and custom and usage may be resorted to in an effort to supply a deficiency if it does not alter or vary the terms of the agreement. [Citations.]" (*Burrow* v. *Timmsen* (1963) 223 Cal.App.2d 283, 288 [35 Cal.Rptr. 668, 100 A.L.R.2d 544]; see also *Masterson* v. *Sine, supra*, 68 Cal.2d 222, 224, 225.) At bottom, "[i]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left. [Fn. omitted.]" (1 Corbin on Contracts (1963) § 95, p. 400.)

In our view, keeping in mind the liberal rules of contract construction just noted, each provision which defendants characterize as fatally uncertain, is either sufficiently certain on its face, or reasonably susceptible to being made sufficiently certain by use of extrinsic evidence presented in an amended complaint concerning the parties' intentions. Accordingly, the trial court erred in sustaining defendants' demurrer based on the contract's alleged uncertainty without offering plaintiff an opportunity to amend its complaint.

#### A. *Purchase price*

Defendants first contend that the contract is too uncertain because it was left to future agreement between the parties. Defendants

argue that the purchase price is fatally uncertain because the parties are required to agree on certain improvement costs which are then used in calculating the total purchase price of the property. Moreover, defendants contend the contract is defectively uncertain because it "fails to provide a procedure for determining the nature, quality, and amount of improvements...to be grouped into the 'improvement cost' category once the nature, quality, and amount of improvements have been determined" and "[w]hile the 'pricing mechanism' provides that in the event of an 'improvement costs' conflict, bids are to be obtained from 'qualified sub-contractors', the 'pricing mechanism' does not define 'qualified sub-contractors', set forth the number of 'qualified sub-contractors' from whom bids are to be obtained,...or provide for the resolution of any conflict that may arise among the bidding sub-contractors." The provision of the contract including the contested terms reads as follows:

"1. The purchase price shall be computed at $13,750.00 per fully improved lot, less the cost to fully improve each lot ('Improvement Costs') to conform to the requirements of the governing agency(s). Buyer and Seller's engineers to concur on the 'Improvement Costs' per lot within 45 days after approval of Seller's tentative map by the governing agency(s). If a conflict should arise, bids from qualified subcontractors shall be used. The purchase price shall be determined by subtracting the agreed upon 'Improvement Costs' from the price of $13,750.00 per lot, multiplied by the number of buildable lots on Seller's tentative map as approved by the governing agency(s). Buyer and Seller shall notify escrow holder of said purchase price."

As to any alleged uncertainty concerning the type of improvements to be made and the costs derived from those improvements, paragraph 12 of the contract, in our view, sets forth sufficiently certain definitions for equitable or legal enforcement. That paragraph provides:

"12. 'IMPROVEMENT COSTS'

"Seller understands that Buyer is purchasing lots for development of single-family residences thereon. Said 'Improvement Costs' referred to in Paragraph 1, above shall include a 10% contingency on all costs and shall include but not be limited to costs for all streets, curbs, walks, driveways, storm drains, utilities, including services to each lot, street lights, installation of trees, and required perimeter walls, all in compliance with all the conditions (including all subdivision improvement agreements) imposed on Seller in connection with the approval of Sell-

er's zoning, the Environmental Impact Report, and the tentative tract map for the property. Also including but not limited to all fees, planting all slopes on the subject property, including a sprinkler system, as well as maintaining it in accordance with the requirements of the governing agency(s)."

Because local governing agency approval of the subdivision map was required before plaintiff and defendants would know *each* required improvement, they obviously did not attempt, in drafting the contract, to provide an exhaustive definition of "Improvement Costs." It is our view, from a perspective of commercial practicability, that paragraph 12 defines with sufficient legal certainty the types of improvements contemplated by plaintiff and defendants to permit the contract's enforcement. To interpret that provision otherwise would effectively render the contract unenforceable until after local governing agency approval had been secured and each improvement cost itemized. The most obvious conclusion suggested by the context of the transaction is that such an interpretation was simply not contemplated by the parties.

In addition, while the contract provides that the parties must negotiate improvement costs once the exact nature of the requested improvements is known, admittedly a provision contemplating future agreement, it also includes an objective method to determine those costs. That method requires that plaintiff and defendants submit a list of the required improvements to qualified subcontractors from whom bids are then received regarding the cost of those improvements. The lowest bid from those received is then used in arriving at a per lot purchase price. California law recognizes the principle that when a contract provides such an objective method for ascertaining the purchase price, the contract should not be construed as too indefinite to be enforced. In *Bewick* v. *Mecham* (1945) 26 Cal.2d 92 [156 P.2d 757, 157 A.L.R. 1277], for example, a lease for a certain parcel of land included an option to purchase exercisable at the lease's expiration. The purchase option provided that the purchase price would be arrived at by later agreement between the parties "and if not agreed on then to be fixed by arbitration, each of the parties...selecting one arbitrator, and the two selected [*sic*] a third, which said arbitrators shall fix such purchase price..." (*Id.* at p. 94.)

The original lessee assigned the lease to plaintiff who, at the lease's expiration, attempted to exercise the option. The lessor refused, however, to comply with the option contract. Plaintiff filed suit for specific

performance and prevailed after trial. Defendant appealed arguing, like defendants here, "that the option agreement was too indefinite to give rise to a contract" because the purchase price was left to future agreement. The Supreme Court dismissed that contention as without merit explaining that "[t]he option covenant providing for the appointment of third persons to ascertain the price was...definite enough to give rise to a contract." (*Id.* at p. 98.)

Similarly, in the case at bench, the contract expressly provides for use of objective third parties, qualified subcontractors, from whom bids are received, the lowest of which are ultimately used in calculating the purchase price of the land on a per lot basis. Based on the rationale of *Bewick*, a price provision of this type is sufficiently certain to permit the contract's enforcement.

■ Finally, defendants contend that the "pricing mechanism" is fatally uncertain because the contract fails to articulate the precise definition of "qualified subcontractors" or the exact number of bids to be taken. Those factors can be determined by looking to the custom, usage and trade within the real estate development industry and other relevant extrinsic evidence. Accordingly, in our view, assuming the contract is defective in that regard, a reasonable possibility exists that plaintiff can cure the defect in an amended complaint by allegations of appropriate extrinsic evidence.

B. *Release clause*

■ Defendants urge that the contract's release clause is too uncertain, thus rendering the contract unenforceable. That clause reads as follows:

"3.   The deed of trust shall cover all of the subject property except ½ of the total lots on the approved tentative map and shall contain the following provisions:

"(a)   'Release Clause: So long as the note secured by this deed of trust is not in default, a partial release, or releases, from the lien of this deed of trust may be had and will be given upon payment on the principal of the note (plus accrued interest thereon) of the prorata indebtedness (then outstanding at time of request for reconveyance) against each lot for each lot to be released. Buyer will furnish Trustee, at time of request for reconveyance, a legal description of the parcel of

land which is to be reconveyed. All payments on the principal of the note secured hereby shall be applied toward releases of land, whether such releases or reconveyances are requested at the time of payment or are requested thereafter, subject to the following:

"(i) 'No release shall be granted which would have the effect of leaving the parcels still subject to the deed of trust separated from each other, other than public dedicated streets, unless access is granted by Trustor.

"(ii) 'The configuration of the acreage to be released may be regular or irregular in shape.

"(iii) 'Releases shall be in increments of 15 lots or more.'"

Defendants argue the clause is defectively uncertain because it fails to indicate which half of the total lots is to be covered as security by the deed of trust, and whether the lots may be released in a contiguous or checkboard fashion. Defendants rely upon *White Point Co.* v. *Herrington* (1968) 268 Cal.App.2d 458 [73 Cal.Rptr. 885], as support for their contention. In that case, a judgment decreeing specific performance for a buyer of real property was reversed on appeal because of perceived uncertainty in a release clause included in the contract. The primary rationale underlying the reviewing court's decision to reverse the plaintiff's judgment was its belief that the trial court had drafted a new contract between the parties clarifying the terms of what originally was a defective and uncertain release clause.

However, of significant importance to our analysis here, the reviewing court in *White Point* also demonstrated understanding of the legal principle that parol evidence and extrinsic evidence concerning custom and usage are properly admissible to clarify otherwise ambiguous terms. (*Id.* at pp. 467-468; see also *Masterson* v. *Sine, supra*, 68 Cal.2d 222, 224.) "Even when the uncertainty of a written contract goes to 'the precise act which is to be done' [citation], extrinsic evidence is admissible to determine what the parties intended. [Citation.] It is only when the extrinsic evidence fails to remove the ambiguity that specific performance must be refused. [Citations.]" (*Crescenta Valley Moose Lodge* v. *Bunt* (1970) 8 Cal.App.3d 682, 689 [87 Cal.Rptr. 428].) In that regard, the *White Point* court concluded that the contract was unenforceable as the result of a fatally uncertain release clause because, during trial, there were "no external standards nor any reference to cus-

tom and usage by which the parties in the present case agreed to be bound, and insufficient parol evidence of what the release clause was intended to contain, there was no sound legal basis upon which to supply the missing terms." (*White Point Co.* v. *Herrington, supra*, 268 Cal. App.2d 458, 468.)

Unlike the reviewing court in *White Point*, we are not in a position to articulate a similar conclusion to justify sustaining the judgment of dismissal as to plaintiff's original complaint. In our view, the trial court's decision in the case at bench prematurely foreclosed plaintiff from the opportunity to plead extrinsic facts and events clarifying the operation of the release clause. Accordingly, the trial court erred in entering judgment of dismissal on this basis, without first giving plaintiff an opportunity to amend its complaint.

### C. *Right to negotiate the purchase price*

■ The contract includes the following provision concerning the right to renegotiate the purchase price per lot: "If governing agencies preclude the acceptance of less than 73 lots by a change in the present zoning criteria then seller shall give buyer the right to renegotiate the purchase price per lot. If improvement costs exceed $4,500 per lot due to a change of present zoning criteria the same right shall be granted."

Defendants successfully argued to the trial court that the provision gave them a right to renegotiate the purchase price of each lot *if* improvement costs were in excess of $4,500 per lot.[4] Because the purchase price was therefore prospectively left to future agreement, i.e., if improvement costs were in excess of $4,500 per lot then a new purchase price would be negotiated, the contract was unenforceable. In contrast, plaintiff argues on appeal that when fairly read the provision only permits renegotiation when a *zoning change* precludes acceptance of less than 73 lots *or* causes improvement costs to exceed $4,500. According to plaintiff, a zoning change never occurred and, as a consequence, a right to renegotiate never arose.

It is clear to us that plaintiff has placed the proper interpretation on the provision, for it clearly provides that a right to renegotiate the purchase price automatically arises *only* when a change in zoning criteria

---

[4]Defendants also interpret that provision as giving them a unilateral right to cancel the contract, a position which is legally untenable as a matter of interpretation.

precludes acceptance of less than 73 lots or causes improvement costs to be in excess of $4,500 per lot. Because, as plaintiff states, a change in zoning criteria never occurred, that particular provision is now irrelevant to the further performance of the contract.

### DISPOSITION

The judgment of dismissal is reversed.

Tamura, Acting P. J., and Kaufman, J., concurred.