688 P.2d 1021

**HORIZON CORPORATION, Plaintiff/Counterdefendant/Appellee,**

v.

**WESTCOR, INC., an Arizona corporation, Defendant/Counterclaimant/Appellant.**

**No. 2 CA–CIV 4883.**

Court of Appeals of Arizona, Division 2.

April 23, 1984.

Review Dismissed Sept. 27, 1984.

D'Antonio & D'Antonio by Patricia A. Ihnat, Tucson, for plaintiff/counterdefendant/appellee.

Murphy & Posner by Daryl M. Williams and K. Bellamy Brown, Phoenix, for defendant/counterclaimant/appellant.

OPINION

HOWARD, Judge.

Westcor, Inc. (Westcor), is a developer and owner of neighborhood and regional shopping centers. Horizon Corporation (Horizon) owned 36 acres of land in Tucson immediately across the street from the Foothills Mall Shopping Center. On April 3, 1978, Westcor and Horizon entered into a

---

contract wherein Westcor agreed to buy and Horizon agreed to sell 11 of the acres. Their agreement was in the form of printed escrow instructions and an addendum which contained the following pertinent provisions:

"1. BINDING AGREEMENT: These Escrow instructions and any addendums hereto constitute a valid and binding agreement between the Seller and Buyer of the sale and purchase of the real property herein described at the price and on all terms and conditions set forth herein and supersedes and supplants any and all previous agreements between the parties written or oral.

\* \* \* \* \* \*

3. CONDITIONS: The obligation of Buyer to consummate the purchase shall be conditioned upon the occurrence of the following conditions subsequent in a manner which is, in all respects satisfactory to Buyer, in Buyer's sole and absolute discretion. Said conditions subsequent shall occur, if at all, on or before the date set for close of escrow. Said conditions are for the sole benefit of the Buyer and may be waived by the Buyer. Waiver, however, shall not be implied but shall be expressed, if at all, in writing.

\* \* \* \* \* \*

B. Buyer's approval of the zoning, site plan (if applicable), and stipulation of site plan approval (if applicable) affecting the property.

C. Buyer obtaining committments [sic], leases or purchase contracts with major retail tenants.

D. Buyer obtaining all necessary interim and permanent financing for the development of the proposed retail shopping center.

\* \* \* \* \* \*

The conditions set forth above shall occur, if at all, on or before the date set for close of escrow. If any one or more of the conditions fail to occur as aforesaid, Buyer, at its option, may either rescind this transaction, in which event all earnest money shall be returned to Buyer, or may, by written notice to Seller and Escrow Agent, waive the occurrence of said condition, in which event this escrow shall close in accordance with the terms hereof.

\* \* \* \* \* \*

13. In the event the above contingencies are not met or waived by the Buyer on or before December 17, 1978, Buyer may extend the close of escrow on a month to month basis for no more than 6 months by depositing $3,000.00 into escrow for each monthly extension, provided, however, that the Buyer is pursuing or has obtained such things as zoning, tenant commitments, financing, etc. These funds shall not apply to the sales price and shall be released to the Seller immediately upon receipt by escrow. Escrow shall receive written notice from Buyer regarding each monthly extension.
\* \* \* "

Paragraph 7 of the printed escrow instructions is also important:
" \* \* \*

7. If either party elects to cancel these instructions because of the failure of the other party to comply with any of the terms hereof within the time limits provided herein, said party so electing to cancel shall deliver to Escrow Agent a written notice to the other party and Escrow Agent demanding that said other party comply with the terms hereof within thirteen days from the receipt of said notice by Escrow Agent or that these instructions shall thereupon become cancelled. If other party fails to comply, these instructions shall be cancelled and the Escrow Agent shall:

(a) First Pay to the party electing to cancel, any earnest money deposited, and pay all other money to the party who made the deposit.

(b) Second, Return all documents deposited to the party who delivered them except documents executed by both Seller and Buyer, which shall be retained in the files of Escrow Agent. \* \* \* "

Under the original agreement of April 3, 1978, Westcor was to approve the zoning and site plan for the property. However, on April 12, 1978, a second addendum was made to the agreement. It read:

"It is hereby agreed between Seller and Buyer that within 60 days from execution of the original Escrow Instructions Buyer shall submit to Seller a preliminary land use plan for the property and within 90 days Buyer shall make a re-zoning application to the appropriating [sic] public authority for the property substantially in accordance with the land-use plan.

As a condition precedent to Buyers [sic] right to extend close of escrow pursuant to Paragraph 13 of the original Escrow Instructions, Buyer shall have obtained and furnished to Seller letters of intent from major retail demands [sic] to locate on the property.

In the event Buyer has not obtained satisfactory financing prior to December 17, 1978 and Buyer elects to extend close of escrow pursuant to Paragraph 13 of the original Escrow Instructions, Buyer agrees to diligently pursue a financing commitment during any such extension."

This second addendum was later revised, in writing, to give Westcor the right to rezone the entire 36 acres of property, with an option to buy the entire 36 acres. This was done to allow Westcor to pay money for the rezoning rather than as an earnest deposit. The original agreement required Westcor to deposit with the escrow a $10,-000 irrevocable letter of credit.

Westcor made application to Pima County for rezoning of the 11 acres but by December 17, 1978, the property had not been rezoned. On February 20, 1979, a fourth and last addendum was made to the original agreement. It extended the agreement for six months, until August 20, 1979, but only 10 acres was to be rezoned to CB–1 and the 10 acres plus 2 additional acres were to be the subject of the sale. It also required Westcor to make application to rezone the entire property and raise the selling price of the property. During the period of December 17, 1978, to February 20, 1979, while the parties were negotiating a restructuring of their agreement, Stan Abrams, the vice president of Horizon and the person with whom Westcor had been dealing, knew that their agreement had a thirteen-day notice requirement and would have instructed the escrow to send the thirteen-day letter if he wanted to terminate the agreement.

Between February and August 1979 Westcor continued its rezoning efforts. Due to the complexity of the matter, and objections from surrounding landowners, the land still had not been rezoned by August 20, 1979, and the parties' efforts to rezone it continued thereafter. Abrams testified, under examination by the court, that the parties were still operating under the agreement after August 20, 1979:

"THE COURT: Did you ever have any discussion from anyone from Westcor about whether the addendum that was entered into February of '79 and perhaps expired in August of '79 was dead, void, in the past, or any discussion about whether you were still operating under it?

THE WITNESS: I don't ever recall, I was aware of the fact that it hadn't closed, but I don't ever recall having a discussion with them that it was dead, or over with, or whatever, you know, the terms that you just used, and as I said, I felt that it was in the company's best interest to continue to pursue this activity.

THE COURT: Did you have any discussions, sir, with them after August of '79 about on what terms any acquisition would be consummated, any acquisition of the land between Westcor and Horizon?

THE WITNESS: It was certainly my opinion that we were dealing under the addendum.

THE COURT: You had a subjective feeling or whatever you want to call it, that you were still operating on the basis of the addendum. Can you tell me why you felt that way? Was there anything

that anybody said or did that made you feel that way?

THE WITNESS: Well, Westcor continued to pursue the zoning. If it wasn't discussed specifically, I certainly had the impression that they were interested in purchasing the property. I recognize that in order to accomplish what they wanted to do, they had to get the property rezoned. I felt that if the property was rezoned, they would consummate the transaction, which I felt was in the best interest of the company, to do.

THE COURT: And for whatever its worth, relevant, or not, that is something that will be decided later on perhaps, are you saying that after August of '79, and that date is in this courtroom because that is the date that the addendum gave Westcor until to satisfy the conditions and accept, at least that is one reading of it, but what I wanted to know was, after August of '79 were you willing to consummate the transaction on the terms of the addendum at the same price?

THE WITNESS: Yes."

And on being examined by Horizon's attorney, Abrams testified as follows:

"Q. (By Mr. D'Antonio) Mr. Abrams, you were still dealing with Westcor on the rezoning after August of 1979; is that right?

A. That is correct.

Q. Well, when you say that you had an ongoing understanding, what did you mean by that?

A. Well, what I meant by that was that I was aware that the—that the escrow agreement had not been closed. It was in the company's best interest to continue to pursue this activity—

Q. Which activity is that?

A. To continue to pursue the activity of attempting to get the property zoned. We had a willing buyer, an ongoing willing buyer, in Westcor, in my judgment, and since, as I said, since they were footing all of the costs of doing this, I felt it was appropriate to continue to work with them to achieve this result."

The record shows that during September and November 1979 the parties continued their attempt to rezone the property. In December 1979 Westcor, with Horizon's knowledge, began offering to buy the homes of the adjoining property owners who were still resisting the zoning application.

The zoning hearing was set for January 22, 1980. Up to that time Horizon was helping Westcor on the rezoning matter but Westcor was doing most of the work. However, at a meeting just prior to the date of the hearing, between Westcor, Horizon and Horizon's lawyer, there was a discussion about postponing the hearing until after the 1980 fall elections because the rezoning matter had become a political football. The parties decided to go ahead with the rezoning hearing but place the matter in a posture that the application could be withdrawn if it appeared that the board of supervisors were about to vote against it. The parties went to the hearing. They did not succeed in getting the property rezoned but did get the board of supervisors to refer the case back to the planning commission before it reached a vote. The parties decided to wait until after the 1980 fall election to resubmit the application. By this time Westcor had expended at least $50,000 in its rezoning efforts. The rezoning of the property was the only condition which had not been met and which prevented the consummation of the contract.

Westcor and Horizon continued to cooperate with respect to the zoning. Attempts were made to generate newspaper support, contacts were made with tenants and potential tenants. With the knowledge and acquiescence of Horizon, Westcor requested the planning and zoning commission not to schedule a hearing on the rezoning application until requested by Westcor. In order to placate objecting landowners, Westcor also developed new plans for the property giving the buildings a Spanish motif. These drawings and plans were being developed as late as March 1980 and were shown to Abrams.

In March 1980 Abrams was suddenly discharged by Horizon and his job was taken over by Donald C. White. Westcor met with White on April 22, 1980, and a chronology of the rezoning effort was related to him, including the fact that they were waiting for the 1980 fall elections before proceeding. This strategy was discussed as was the possibility of joint venturing the deal. Nothing was said by White to the effect that Horizon considered the sale agreement cancelled nor did Westcor ever expressly say that it considered the agreement still in effect.

After the April 22, 1980, meeting, Westcor considered a joint venture with Horizon but rejected it. In August 1980 Westcor also inquired on what terms Horizon would sell the entire 36 acres on an "as is" basis, but rejected the offer made to it by Horizon.

Unknown to Westcor, in August 1980 Horizon had entered into negotiations to sell the property to a third party. When Westcor learned in October 1980 that Horizon had contracted to sell the property to this third party, it sent a telegram to White informing him that the escrow instructions were still in full force and effect and that Horizon, therefore, could not sell all the property. Westcor then waived all contingencies and tendered full performance including depositing $200,000 into escrow.

Horizon filed this action to quiet title and Westcor counterclaimed for specific performance. The trial court, sitting without a jury, awarded Horizon judgment quieting title in it and denying Westcor's request for specific performance. In so doing the trial court made findings of fact and conclusions of law. Westcor has no quarrel with the court's findings of fact. As for the trial court's conclusions of law, it found, inter alia, that (1) there was no valid contract between the parties because the conditions subsequent made Westcor's promises to perform illusory, hence, no consideration; (2) even if there were a valid contract, it expired on August 20, 1979; (3) the thirteen-day notice provision dealt only with the escrow termination consequences,

such as the return of the earnest money, and was not a pre-requisite to the valid cancellation of the contract.

Westcor contends that these conclusions of law are erroneous and that the trial court should have granted it specific performance. We agree.

## THE VALIDITY OF THE CONTRACT

The trial court, in its conclusions of law, found that since the conditions of paragraph three were subject to the sole and absolute discretion of Westcor, were for the sole benefit of Westcor and could be waived by Westcor, that Westcor had unlimited discretion whether to perform, making its promise illusory and the contract, therefore, unsupported by any consideration. We do not agree.

In *Shattuck v. Precision Toyota, Inc.*, 115 Ariz. 586, 566 P.2d 1332 (1977), the court stated that an illusory contract is unenforceable for lack of mutuality. The court quoted from *Naify v. Pacific Indemnity Company*, 11 Cal.2d 5, 76 P.2d 663 (1938):

"Parties are, within reason, free to contract as they please, and to make bargains which place one party at a disadvantage; but a contract must have mutuality of obligation, and an agreement which permits one party to withdraw at his pleasure is void." 11 Cal.2d at 11, 76 P.2d 663.

*Shattuck* states the general rule but recitation of this rule merely begs the question which we have before us. Is a contract with a "satisfaction clause", such as we have here, illusory? The modern cases hold that it is not. In *Mattei v. Hopper*, 51 Cal.2d 119, 330 P.2d 625 (1958), the plaintiff was a real estate developer planning to construct a shopping center on a tract of land adjacent to the defendant's land. The parties entered into a deposit and receipt agreement wherein the plaintiff was to deposit $1,000 of the total purchase price of $57,500 and was given 120 days to examine the title and consummate the purchase. At the end of that period the balance was due and payable upon the tender of a good and

sufficient deed. The concluding paragraph of the deposit and receipt agreement provided, "... subject to Coldwell Banker and Company obtaining leases satisfactory to the purchaser." Plaintiff paid the $1,000 and was in the process of arranging for leases of the proposed shopping center when the defendant gave notification that she would not sell her land. Subsequently, the defendant was informed that satisfactory leases had been obtained and the plaintiff tendered performance. Defendant refused to tender a deed. The trial court concluded that the agreement was "illusory" and lacking in "mutuality". The California Supreme Court reversed.

In so doing, the court reasoned the California courts recognized two tests in assessing the validity of satisfaction clauses. First, where commercial value or quality is an issue, an objective standard of reasonableness is applied in determining whether satisfaction is received. Second, if the question of whether satisfaction is received is based upon subjective factors, the party exercising that judgment is required to adhere to an implied duty of good faith. Moreover, in this latter context, the court explained "... that the promisor's duty to exercise his judgment in good faith is an adequate consideration to support the contract." 330 P.2d at 627. The court held "... that the contract ... was neither illusory nor lacking in mutuality of obligation because the parties inserted a provision in their contract making plaintiff's performance dependent on his satisfaction with the leases to be obtained by him." 330 P.2d at 628–629.

In *Rodriguez v. Barnett*, 52 Cal.2d 154, 338 P.2d 907 (1959) which involved a land sale contract, the buyer's obligation to purchase was conditioned on satisfaction with, and approval of, a subdivision map which had been submitted to the City of Riverside. In rejecting the contention that the "satisfaction clause" made the contract illusory, the court stated:

"The agreement was neither illusory nor lacking in mutuality of obligation merely because the parties thereto inserted a provision making the purchasers' performance dependent on their satisfaction with the subdivision map to be obtained by them. Contracts making the duty of performance of one of the parties conditional upon his 'satisfaction' are upheld on the theory that the expression of dissatisfaction must be genuine and not arbitrary and that an objective criterion—good faith—controls the exercise of the right to determine satisfaction. * * *" 338 P.2d at 911.

In *Larwin-Southern Cal, Inc. v. J.G.B. Investment Company, Inc., et al.*, 101 Cal. App.3d 626, 162 Cal.Rptr. 52 (1979) the buyers' obligation to purchase the property was subject to the buyer's approval of a preliminary title report, its approval of its engineering report as to soil conditions, dirt balance, drainage, utility requirements and its economic feasibility study, and the approval of a tentative map. The contract also provided "buyer's approvals provided for in this paragraph may be given or withheld in its sole judgment and discretion, and the lack of approvals shall be deemed to be disapprovals. All approvals shall be in writing." 162 Cal.Rptr. at 58. In holding that the "satisfaction clause" did not make the agreement illusory the court stated:

"The Supreme Court's analyses and holdings in *Mattei* and *Rodriguez* are readily applicable to the case at bench. Plaintiff's right to approve or disapprove is a satisfaction clause of the subjective type. Accordingly, plaintiff, in deciding whether to exercise its approval or disapproval was required to do so within the parameters of the duty of good faith. That duty constitutes legally sufficient consideration to establish mutuality of obligation. Thus, defendants' contention that the presence of the satisfaction clauses in this contract render it unenforceable is without merit." 162 Cal. Rptr. at 59.

The California case of *Mattei v. Hopper, supra*, was followed by the Court of Appeals of Washington in the case of *Omni Group, Inc. v. Seattle-First National*

*Bank,* 32 Wash.App. 22, 645 P.2d 727 (1982). There the earnest money agreement was subject to the purchaser receiving an engineering and architectural feasibility report satisfactory to the purchaser. The trial court found the contract illusory, but the appellate court reversed. The Washington appellate court also quoted from Corbin on Contracts, Vol. 3A, Sec. 644, which states:

> "... a contractor can, by the use of clear and appropriate words, make his own duty expressly conditional upon his own personal satisfaction with the quality of the performance for which he has bargained and in return for which his promise is given. Such a limitation on his own duty does not invalidate the contract as long as the limitation is not so great as to make his own promise illusory." Vol. 3A, at 78–79.

■ We previously recognized that a buyer must make a good faith effort to fulfill conditions. See *Nationwide Resources v. Massabni,* 134 Ariz. 557, 658 P.2d 210 (1982). We agree with the foregoing California and Washington cases. The satisfaction clause in the contract between Westcor and Horizon was of the subjective type and Westcor, in deciding whether to exercise its approval or disapproval was required to do so in good faith. Therefore, the promises which it undertook under the contract were not illusory.

## THE EXPIRATION OF THE CONTRACT

■ The trial court found, as a matter of law:

> "Even if there was a valid contract, Westcor did not perform in that it did not timely make or tender the performance by August 20, 1979. The conduct undertaken thereafter by Horizon did not constitute a waiver of the requirement that acceptance be made no later than six months following February 20, 1979, i.e. by August 20, 1979."

Neither the findings of fact by the trial court, nor the record suggest this conclusion of law. In fact, they support only one conclusion—that the parties considered their contract still to be in existence. At the very least, Horizon, by its conduct, is estopped from asserting that the contract expired on August 20, 1979. Its conduct in the rezoning matter, allowing Westcor to do the work and incur the expenses, its meeting with Westcor and acting in conjunction with it, estops it from asserting that their agreement had expired. Since the agreement had not expired by August 20, 1979, it could only be cancelled according to its terms.

## THE THIRTEEN–DAY LETTER

■ Horizon relies on the case of *Allan v. Martin,* 117 Ariz. 591, 574 P.2d 457 (1978) for the proposition that the thirteen-day letter requirement was not necessary in order to cancel the agreement of the parties. We do not agree. In *Allan v. Martin, supra,* there were two separate and distinct documents, a contract to sell real estate and escrow instructions. The thirteen-day letter provision was in the escrow instructions. The contract itself contained its own time for performance of the contract. The court held that the contract and escrow were two different documents and that the time for performance was governed by the contract itself and after the time passed in the contract the escrow instructions became unenforceable because there was no longer a binding contract to sell the property which was the subject of escrow. That is not the case here. The escrow instructions here were the contract. Without the escrow instructions there would have been no contract. The provisions here are similar to those that were contained in the case of *O'Hare v. Griesmer,* 132 Ariz. 30, 643 P.2d 733 (1982). There the language read:

> "If either party elects to cancel this agreement because of the failure of the other party to comply with all the terms and conditions of this agreement, the party so electing shall, after the expiration of the time periods as provided in A.R.S. § 33–741, from date provided herein for closing, instruct escrow agent to cause to be delivered to the other

**136**

party a written demand for compliance within ten days after the date said demand was deposited in the United States mail ... However, this agreement may be enforced by specific performance or other appropriate remedy." 132 Ariz. at 33, 643 P.2d 733.

In *O'Hare* we held that if the sellers desired to cancel the agreement they were required to give the ten day notice. In *Secan v. Dunbar, et al.*, 139 Ariz. 503, 679 P.2d 526 (1983) we had under consideration the same provision that we had in the *O'Hare* case. We set forth the entire language of the provision in *Secan* which was omitted in *O'Hare*. The omitted language was:

"* * * If the addressed party then fails to comply within the stated period, the escrow shall pay to the party electing to cancel any earnest money deposited. Costs already incurred in closing and/or any obligation for brokerage fee may be deducted from the earnest money if the purchaser is the party in default ...."

We again held that the provision required that notice of cancellation be given in order to cancel the contract. We also rejected the argument made by appellees and similar to the conclusions of the trial court here, that the ten-day notice was required only if the party wishing to cancel wanted the earnest money.

It is clear that the thirteen-day letter requirement is not merely for the benefit of the escrow but is the only way in which the parties here could cancel the contract. The uncontradicted evidence is that the parties construed the contract in such a manner.

Since the contract was in full force and effect when Westcor tendered performance, Horizon is entitled to specific performance.

The judgment of the trial court is reversed with directions to enter a judgment in favor of Westcor and against Horizon on Horizon's complaint and enter a decree of specific performance in favor of Westcor and against Horizon.

 Westcor has requested attorney's fees on appeal. This matter arises out of a contract and Westcor is entitled to fees as the successful party on appeal. *Wenk v. Horizon Moving & Storage Co.*, 131 Ariz. 131, 639 P.2d 321 (1982). The amount will be determined upon the submission of Westcor's statement of costs pursuant to Rule 21(c), Arizona Rules of Civil Appellate Procedure, and *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (1983).

BIRDSALL, C.J., and HATHAWAY, J., concur.