204 P.3d 390

**Ivo QUEIROZ, an unmarried man, Plaintiff–Counterdefendant/Appellant,**

v.

**Daniel HARVEY, Defendant–Counterplaintiff/Appellee.**

**No. 1 CA–CV 07–0309.**

Court of Appeals of Arizona, Division 1, Department B.

May 15, 2008.

Review Granted Jan. 6, 2009.

Gust Rosenfeld P.L.C. By Charles W. Wirken, Phoenix, Attorneys for Appellant.

Jennings, Strouss & Salmon, P.L.C. By David B. Earl, David Brnilovich, Garrett J. Olexa, Phoenix, Attorneys for Appellee.

## OPINION

JOHNSEN, Judge.

¶ 1 Ivo Queiroz ("Buyer") appeals a judgment denying him specific performance of a contract by which he agreed to purchase 20 acres of land in Tonopah from Daniel Harvey ("Seller"). The superior court found that Buyer materially breached the contract by failing to promptly deposit earnest money and that his attempted deposit after Seller orally cancelled the contract was invalid. The court also held that even if Buyer timely cured his breach, specific performance would

be denied due to inequitable conduct by Buyer's agent. We conclude that Buyer cured his breach before Seller cancelled the contract pursuant to its terms and hold that inequitable acts of the Buyer's agent may be attributed to Buyer so as to bar his claim for specific performance only if Buyer knew of those acts. Accordingly, we vacate the judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Seller listed 10 acres of land for sale with real estate agent Debra Walters. Buyer was represented in the transaction by his friend and roommate Charles Harrison, a real estate agent. On December 7, 2004, Harrison prepared a form real estate purchase contract on Buyer's behalf and faxed it to Seller, offering to pay $150,000 for 20 acres, including the 10 acres originally listed. The next day, Seller faxed a counteroffer to Buyer, changing the down payment amount and substituting "Westland Title Agency" as the designated escrow company, but noting that "ALL other terms and conditions [were] to remain the same." Buyer accepted the counter-offer that same day.

¶ 3 The contract called for most of the purchase price to be seller-financed and for escrow to close on February 15, 2005. The receipt section of the contract stated that Buyer had given a $1,000 personal check to his agent Harrison as earnest money. It further recited ("Broker" for this purpose being Harrison):

> Earnest money shall be held by Broker until offer is accepted. Upon acceptance, Broker shall promptly deposit the earnest money with any escrow company to which the check is payable. If the check is payable to Broker, Broker may deposit the check in Broker's trust account or endorse the check without recourse and deposit it with a duly licensed escrow company. Buyer agrees that, if Buyer breaches this Contract, any earnest money is subject to forfeiture. If any check for earnest money is dishonored for any reason, Seller may, at Seller's option, immediately cancel this Contract pursuant to Lines 352–355.

¶ 4 Line 12 in the receipt section of the contract called for the agent's name and business information and provided a space for the agent's signature to signify receipt of the earnest money. Harrison filled out the business information and printed "C.A. Harrison" in the space labeled "Received By." He left blank the space for his signature, however.

¶ 5 The contract provided that time was of the essence and also contained a "Remedies" section, which detailed the parties' remedies for breach and the procedure for cancelling the contract. This section stated in pertinent part, "If either party breaches in any respect on [sic] any material obligation under this Contract, the non-breaching party may elect to be released from all obligations under this Contract" as further provided in lines 352–355 of the contract. Lines 352–355 provided:

> Cancellation: Except as otherwise provided herein, any party who wishes to cancel this Contract because of any material breach by the other party, and who is not in material breach except as occasioned by a material breach by the other party, may cancel this Contract by delivering written notice of cancellation to either the breaching party or to the Escrow Company stating the nature of the breach. Cancellation shall become effective immediately upon delivery of the written notice of cancellation to either the breaching party or Escrow Company.

¶ 6 On Friday, December 10, 2004, Harrison faxed the contract to Angi Alex, an escrow agent in the Glendale office of Westland Title. Alex opened escrow on Monday, December 13. Walters testified that she called Harrison on December 13, 15 and 16 to inquire about the earnest money deposit, but Harrison did not answer and did not return the calls. On Friday, December 17, Walters called Alex and, after determining that Buyer had not yet deposited the earnest money, announced to Alex on the phone that the deal was cancelled. That same day, Walters called Harrison and left a message that the contract was cancelled. This time Harrison returned the call and Walters explained the contract was cancelled because of the failure to deposit earnest money.

¶ 7 Early Monday morning, December 20, Harrison withdrew $1,000 out of his personal account, bought $1,000 in money orders, and went to the escrow company's Phoenix office to make the earnest money deposit. When he arrived, Harrison was told that he could make the deposit at that office even though the file for the escrow was in the Glendale office. Some hours after Harrison deposited the earnest money, Seller's written cancellation notice arrived by facsimile at Alex's office.

¶ 8 Buyer filed a complaint against Seller, alleging breach of contract and seeking specific performance or damages, in the alternative. After Seller's denial, the court held a two-day bench trial. Buyer presented evidence that he had given Harrison $3,000 to hold in Harrison's personal bank account, that the earnest money deposit was not late by industry standards and that Buyer had fulfilled his obligations under the contract before Seller cancelled in writing.

¶ 9 Seller, on the other hand, presented evidence that Buyer had not given Harrison a check for earnest money, that Walters called Harrison several times to inquire about earnest money but Harrison did not return the calls, that Walters three times had orally told Harrison the contract was cancelled, and that industry standard is to deposit earnest money into escrow at the same time as the contract is signed.

¶ 10 At the close of evidence, Buyer elected specific performance as his remedy. After taking the matter under advisement, the court entered detailed findings and conclusions. Those pertinent to our discussion are the following:

3. The testimonies of the two real estate agents are contradictory. For example, Mr. Harrison says that no one called him about an earnest money payment; Ms. Walters says she called and left messages several times. They dispute what transpired in a telephone conversation on cancellation of the contract. Where the testimony conflicts, the Court finds Ms. Walters is the more credible witness.

\* \* \*

9. ... On these facts, the failure of the buyer to deliver earnest money to the escrow agent by the close of business on Friday, December 17, 2004, seven days after the contract was delivered to the escrow agent, was not "prompt" and was a material breach of the contract triggering the seller's right to cancel the contract.

10. On Friday, December 17, 2004[,] at 4:45 p.m., Ms. Walters e-mailed or telephoned [Westland Title] and advised them that Seller cancelled the contract.[1]

11. Between Friday evening and Saturday evening, December 17 to 18, Mr. Harrison finally called Ms. Walters. Ms. Walters told him that Seller cancelled the contract.

\* \* \*

13. On Monday morning, December 20, 2004, Mr. Harrison brought money orders for $1,000 to [Westland Title] in Phoenix....

14. There was a fact issue at trial as to whose money this was: whether it was money belonging to [Buyer] or money belonging to Mr. Harrison. The earnest money came from Mr. Harrison's account. Mr. Harrison testified that [Buyer] gave him money, $3,000, to hold for him in Harrison's bank account when he came to Arizona. Mr. Harrison could not point to any deposit on any bank statement to reflect that transfer. The Court does not find Mr. Harrison's testimony credible.

15. On Monday afternoon, December 20, 2004, Seller faxed to the escrow agent a handwritten notice of cancellation because "Buyer failed to deposit earnest money promptly to [the] escrow company." The fax came in at 1:16 p.m.

16. Under the facts and circumstances here, where seller declared a material breach on Friday, December 17, 2004[,]

---

1. Although the superior court found that Walters "e-mailed or telephoned" the escrow company with the notice of cancellation, no reference to an email to that effect is found in the record, and, as noted, ¶ 21 *infra,* during oral argument on appeal, Buyer's counsel conceded that cancellation did not occur until after the Monday morning deposit of earnest money.

and faxed a written cancellation on Monday, December 20, [2004,] the Court does not find that the "rush to the escrow agent," which was won by [Buyer], cures the material breach. First, to be sure, defendant seller can waive the "prompt" requirement and accept late payment, but that did not happen here. Second, [Seller] elected to cancel the contract; and the contract has no "cure" provision for this material breach.

17. Even if the Court were to consider the payment prompt, there are a number of equitable considerations that would result in the Court denying specific performance. First, Mr. Harrison testified he did not sign the initial purchase offer—he just printed out his name—because he did not have a check for the earnest money. The Court finds this type of conduct a trick, and less than candid and honest. Second, the Court does not believe Mr. Harrison has been truthful to the Court. The Court believes that Mr. Harrison did not return phone calls, precipitating this conflict; and either paid his own money into escrow, or made an undisclosed oral loan to [Buyer], or, if he is to be believed, once the purchase contract was made he did not take the earnest money out of his account and commingled the earnest money with his money until the morning it was paid over to the escrow agent. Finally, upon learning that the seller cancelled the contract, Mr. Harrison raced to the escrow agent to deposit the funds before the written notice of cancellation was received. The inequitable conduct of [Buyer's] agent, Mr. Harrison, is sufficient to defeat specific performance. Where the buyer and the agent live together, as here, the Court attributes the agent's conduct to the buyer.

¶ 11 Buyer appeals the judgment against him. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## DISCUSSION

### A. Standard of Review.

¶ 12 "We view the facts in the light most favorable to sustaining the trial court's judg-ment," *Sw. Soil Remediation, Inc. v. City of Tucson,* 201 Ariz. 438, 440, ¶ 2, 36 P.3d 1208, 1210 (App.2001), and will "defer to the trial court's factual findings as long as the record supports them," *In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source,* 198 Ariz. 330, 337, ¶ 15, 9 P.3d 1069, 1076 (2000). However, we review *de novo* pure questions of law and mixed questions of law and fact. *See Robson Ranch Mountains, L.L.C. v. Pinal County,* 203 Ariz. 120, 125, ¶ 13, 51 P.3d 342, 347 (App.2002).

### B. Buyer Cured by Depositing the Earnest Money Before the Contract Was Cancelled.

¶ 13 Buyer does not dispute the trial court's conclusion that his failure to make the earnest money deposit by Friday, December 17 was a material breach. He contends, however, that he cured that breach by making the deposit the following Monday morning. He argues that because he cured before Seller gave written notice of cancellation, the Seller's cancellation notice was of no effect.

¶ 14 Our cases teach that when a breach occurs and the contract provides an exclusive procedure for cancellation upon breach, the non-breaching party's failure to follow that procedure leaves the contract intact and allows the breaching party to cure the breach. *See Horizon Corp. v. Westcor, Inc.,* 142 Ariz. 129, 136, 688 P.2d 1021, 1028 (App.1984); *Blackmore v. Honnas,* 141 Ariz. 354, 356, 687 P.2d 362, 364 (App.1984); *Secan v. Dunbar,* 139 Ariz. 503, 506, 679 P.2d 526, 529 (App.1983); *O'Hare v. Griesmer,* 132 Ariz. 30, 33, 643 P.2d 733, 736 (App.1982). As the court stated in *Blackmore,* "[I]f the agreement is not cancelled as required by its terms, it may continue to be viable and a party who originally was not in compliance may later comply and force specific performance." *Id.* at 356, 687 P.2d at 364.

¶ 15 Each of the cases cited in the preceding paragraph involved a form real estate contract that, like the contract at issue here, established a specific and exclusive cancellation procedure:

> If either party elects to cancel this agreement because of the failure of the other party to comply with all the terms and

conditions of this agreement, the party so electing shall ... instruct the escrow agent to cause to be delivered to the other party a written demand for compliance within ten days [after the date] said demand was deposited in the United States mail.... If the addressed party then fails to comply within the stated period, the escrow shall pay to the party electing to cancel any earnest money deposited.

*Secan,* 139 Ariz. at 504, 679 P.2d at 527.[2]

¶ 16 In *Horizon,* escrow failed to close on the stated date and months later, after learning the seller intended to back out of the contract, the buyer waived all contingencies and tendered full performance. 142 Ariz. at 133, 688 P.2d at 1025. After the seller sued to quiet title, the court held the buyer was entitled to specific performance because the seller had not cancelled the contract pursuant to its terms before the buyer performed. *Id.* at 136, 688 P.2d at 1028. Because the seller had not sent the required notice of cancellation, "the contract was in full force and effect." *Id.* The same result occurred in *O'Hare,* in which the seller contended that buyer breached by failing to close escrow by the designated date. 132 Ariz. at 33, 643 P.2d at 736. "Although the [buyer] did nothing toward performance during the [escrow period], he had a right to rely on the contract provision requiring notice to him if the sellers were going to cancel." *Id.*

¶ 17 In *Secan,* the seller attempted to cancel the contract due to the buyer's nonperformance, but the seller's cancellation letter did not contain the required 10–day–notification language. 139 Ariz. at 505, 679 P.2d at 528. A week after the attempted cancellation and 39 days after the agreed-upon closing date, the buyer tendered performance. *Id.* In affirming relief to the buyer, the *Secan* court found that although the buyer's failure to close on time gave the seller the right to cancel the contract, the seller could cancel only according to the method specified in the contract. *Id.* at 506, 679 P.2d at 529. Thus, although the buyer initially failed to comply with the agreement, he "rectified the failure" by complying with

the contract's requirements before the seller sent the required form of cancellation notice. *Id.*

¶ 18 In our case, as noted above, the contract likewise provided for an exclusive method of cancellation, one which required written notice that expressly was effective only upon delivery either to "the Escrow Company" or the breaching party. Buyer's failure to promptly deposit the earnest money entitled Seller to cancel the contract, but cancellation could be effective only if performed in the manner specified in the contract. Pursuant to the contract, cancellation was "effective immediately *upon delivery of the written notice of cancellation,*" and not until that time. For that reason, the oral notice of termination Seller's broker gave on Friday, December 17, was not effective. *See Trevillian v. Lee,* 111 Ariz. 229, 231, 527 P.2d 100, 102 (1974) (when manner in which seller may enforce a forfeiture of a real estate contract "was governed by the terms of the contract," "party seeking forfeiture must comply strictly with all contract requirements").

¶ 19 A cancellation notice conforming to the requirements of the contract was not delivered to the escrow company until the afternoon of the following Monday, but by that time, through Harrison, Buyer already had deposited his earnest money. Thus, as in the cases cited above, Buyer cured his breach before the contract was cancelled, and his claim for specific performance could not be denied on the ground that the contract was cancelled before he performed.

¶ 20 Seller argues that the cases cited in ¶ 14, *supra,* do not apply because the cancellation provision at issue in each of them required the non-breaching party to provide written notice of a cure period before cancellation could become effective. Seller misapprehends the significance of those cases, which is not that a cure period must be provided when the contract requires it, but that a breaching party may cure at any time before the non-breaching party exercises its right to cancel the contract according to its

---

2. Essentially the same provision was at issue in each of the cited cases, except that the contract

in *Horizon* specified a 13–day notice period. 142 Ariz. at 135–36, 688 P.2d at 1027–28.

terms. Here, the contract provided a specific method by which Seller could terminate Buyer's ability to cure. Because Buyer performed before Seller complied with the required cancellation procedure, the breach was cured, and Seller no longer had the power to terminate the contract.[3]

¶ 21 At oral argument on appeal, counsel for Seller conceded that the oral notice of cancellation was ineffective, but argued that even though the contract remained in effect, Seller nevertheless had the power to reject Buyer's attempted cure. Seller cites no authority, and we have found none, in support of that argument or the contention that having breached, Buyer was not permitted to cure simply because the contract lacked an express cure provision.

¶ 22 To the contrary, the general rule is that a party that has materially breached a contract is given a reasonable period of time in which to cure, even if the contract contains no express cure provision. *See* Restatement (Second) of Contracts ("Restatement") § 242 (1981); 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.18, at 825 (3d ed.2004). As the Restatement explains, an uncured material breach suspends the non-breaching party's duty to perform and may also discharge the non-breaching party from the contract. Restatement § 242 cmt. a. The Restatement warns, however, "Ordinarily there is some period of time between suspension and discharge, and during this period a party may cure his failure." Farnsworth explains the principle as follows:

> Although a material breach justifies the injured party in exercising a right to self-help by suspending performance, it does not necessarily justify the injured party in exercising such a right by terminating the contract. Fairness ordinarily dictates that the party in breach be allowed a period of time—even if only a short one—to cure the breach if it can.

Farnsworth, *supra*, at 825.

¶ 23 The duration of the cure period to be provided the breaching party de-

pends on "significant circumstances" that include, *inter alia*, the extent to which the delay may prevent the non-breaching party from "making reasonable substitute arrangements" and whether the contract contains a time of the essence clause. Restatement § 242 and cmt. d; *see also Am. Outdoorsman, Inc. v. Pella Prods., Inc.*, 144 P.3d 81, 2006 WL 3000779, **8–9 (Kan.App.2006) (non-breaching party must give the other a reasonable time to cure a material breach, citing Restatement § 242 and Farnsworth); *Frazier v. Mellowitz*, 804 N.E.2d 796, 803–05 (Ind.App.2004) (fact issues concerning material breach and cure period prevented summary judgment). A cure period may be imposed even where a party has materially breached a contract that, like the one at issue here, provides that time is of the essence. In such a case, according to the Restatement, the breaching party may be entitled a reasonable period in which to cure "[a]bsent other circumstances indicating that performance" at the stated time "is of genuine importance." Restatement § 242 cmt. d and illus. 9; *see also Found. Dev. Corp. v. Loehmann's, Inc.*, 163 Ariz. 438, 449, 788 P.2d 1189, 1200 (1990). In this case, we have no reason to determine a reasonable cure period pursuant to Restatement § 242 because Buyer cured his material breach prior to Seller's exercise of the cancellation right granted him by the contract.

### C. Harrison's Acts May Not Defeat Buyer's Claim for Specific Performance Absent Proof that Buyer Was Aware of the Acts.

¶ 24 "Specific performance is ordinarily available to enforce contracts for the sale of real property because land is viewed as unique and an award of damages is usually considered an inadequate remedy." *Woliansky v. Miller*, 135 Ariz. 444, 446, 661 P.2d 1145, 1147 (App.1983). "Wide discretion is afforded the trial court to determine whether

---

**3.** Seller also argues that no enforceable contract existed because Buyer's failure to deposit earnest money constituted a failure of consideration. Seller concedes that under general contract law, mutual promises to buy and sell real estate are sufficient consideration for the contract. In the absence of any authority to support the proposition that the earnest money deposit is required consideration, we reject Seller's argument.

damages are an adequate remedy in contracts concerning the sale of real property, and specific performance is never a matter of absolute right." *Id.*

¶ 25 As noted, the superior court denied Buyer's claim for specific performance because of what it concluded were inequitable acts by Harrison, Buyer's real estate agent. We acknowledge the general rule that an agent's actions within the scope of his duties are attributable to the principal. *See Scott v. Allstate Ins. Co.*, 27 Ariz.App. 236, 239, 553 P.2d 1221, 1224 (1976). We deal here, however, with a particular combination of agency and equity principles under which, by contrast to the general rule, the agent's conduct may not be attributed to the principal unless the principal is aware of the agent's conduct.

¶ 26 As explained by one federal court:

Our concern is the responsibility of the principals ... in connection with the application of the equitable maxim of unclean hands. The authorities are few as to the responsibility of a principal, as to unclean hands, for reprehensible conduct by the agent which, if done by the principal, would require application of the maxim. Those authorities are unanimous in holding that knowledge in the principal of such acts by the agent is necessary and that such knowledge cannot be 'imputed' to the principal merely because it is within the knowledge of the agent.

*Am. Ins. Co. v. Lucas*, 38 F.Supp. 896, 922 (W.D.Mo.1940), *aff'd sub nom.*, *Am. Ins. Co. v. Scheufler*, 129 F.2d 143 (8th Cir.1942) (citing *Todd Protectograph Co. v. Hedman Mfg. Co.*, 254 F. 829 (N.D.Ill.1919); *Associated Press v. Int'l News Serv.*, 240 F. 983 (S.D.N.Y.1917), *modified by* 245 F. 244 (2d Cir.1917), *aff'd by* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918); *Vulcan Detinning Co. v. Am. Can Co.*, 72 N.J. Eq. 387, 67 A. 339 (1907)).

¶ 27 In *Associated Press*, a news organization moved to enjoin a rival organization from appropriating its "news." 240 F. at 984. The defendant argued that the plaintiff was not entitled to equitable relief because of inequitable actions of one of its agents. *Id.* at 988–89. In granting relief to the plaintiff, the court held:

[T]he doctrine that he who comes into equity must come in with clean hands does not recognize mere imputations of guilt based upon technical theories of agency. To invoke it[,] a knowledge must exist on the part of the principal of the facts upon which the charge of unconscionable conduct is based....

*Id.* at 989. Because the defendant did not show that the plaintiff's officers or managers participated in or knew about the alleged inequitable acts, the doctrine of unclean hands did not bar the plaintiff from seeking equitable relief. *Id.*

¶ 28 In *Vulcan*, a company moved to enjoin another from using its secret manufacturing process, but the trial court dismissed the action based on unclean hands. 67 A. at 340. Reversing the dismissal, New Jersey's highest court held that while a principal usually is bound legally by his agent's unauthorized actions, in equity, if the principal is unaware of the agent's inequitable acts, those acts cannot be attributed to the principal. *Id.* at 341. The court stated:

In reaching [its] conclusion the learned Vice Chancellor fell, we think, into the error of ascribing an unconscionable status to the [plaintiff company] by force of a presumption of remedial law that in its most extreme application affects only the legal rights of parties and not at all their moral standing. That the knowledge possessed by an agent, but not acquired by him while acting for his principal, will under certain conditions be imputed to the latter, is in the nature of a presumption indulged in by courts in working out the rights of litigating parties.... [B]y the hypothesis, the principal is not only ignorant of the knowledge thus acquired, but, if such knowledge involves a fraud, the principal is innocent of such fraud. True, he may be bound by it in the sense that his legal rights may be determined with reference to the knowledge with which he is thus chargeable; but his conscience is void of offense, and hence it cannot with any propriety be said that his hands are unclean, for 'unclean hands,' within the mean-

ing of the maxim of equity, is a figurative description of a class of suitors to whom a court of equity as a court of conscience will not even listen, because the conduct of such suitors is itself unconscionable....

*Id.*

¶ 29 While no Arizona court has addressed the question of when an agent's acts may be attributed to the principal for purposes of equitable defenses, our supreme court has established the rule that equitable relief may be denied to a party under the unclean hands doctrine only if the party has engaged in "willful" misconduct. In *Weiner v. Romley*, 94 Ariz. 40, 381 P.2d 581 (1963), a car owned by a wife as separate property was attached in a third-party's lawsuit against her husband. *Id.* at 42, 381 P.2d at 582. The husband's attorney prepared and had the wife co-sign a letter to the plaintiff stating that she and her husband owned a house together and that if the plaintiff would release the car, they would agree not to sell the house without the plaintiff's permission. *Id.* The letter was false because the house, too, was owned solely by wife as her separate property. *Id.* After the car was released and the plaintiff succeeded in his case against the husband, the plaintiff attached the house and sold it to satisfy the judgment. *Id.*

¶ 30 When the wife brought a quiet title action, the defendant argued that the wife could not succeed in equity because she lacked clean hands, having signed the letter that mischaracterized the character of the house. *Id.* The court rejected that argument because of the principle that "misconduct which will deprive a part[y] of equitable relief must be willful." *Id.* at 43, 381 P.2d at 583. The court granted the wife relief, concluding that the evidence showed that the wife was merely mistaken in signing the letter and there was no evidence that she had

"intentionally soiled" her hands, acted willfully to deceive or had otherwise acted in bad faith. *Id.* at 43, 381 P.2d at 583.

██ ¶ 31 *Weiner* and the other cases cited above together teach that equitable relief may not be denied a party on the basis of unclean hands or inequitable conduct unless the party himself participated in or had knowledge of the alleged inequitable acts. *See also, e.g., Landers v. Biwer*, 714 N.W.2d 476, 482 (N.D.2006) (buyer's own misrepresentation of nature of agreement precluded specific performance); *Gordin v. Shuler*, 704 S.W.2d 403, 408 (Tex.App.1985) (same).[4] This means that inequitable conduct by a principal's agent without the principal's knowledge or participation may not be a ground on which to deny equitable relief to the principal.[5]

¶ 32 Seller argues that Buyer was aware of the acts by Harrison that the superior court found to be inequitable. He points to the fact that Buyer knew that, contrary to the representation in the "receipt" portion of the contract, Harrison was not in possession of his earnest money deposit check. But Seller points to no evidence, and the superior court made no finding, that Buyer was aware of the several other inequitable acts by Harrison that the superior court cited. Because we cannot determine whether the superior court, acting in equity, would have denied specific performance based solely on Harrison's misrepresentation that he possessed Buyer's check at the time the contract was executed, we must vacate and remand the judgment in favor of Seller.

## CONCLUSION

¶ 33 For the reasons stated above, we vacate the judgment, including all awards of attorney's fees, costs and damages, and re-

---

4. *But see Rice v. Findlay Co.*, 38 Pa.C.C. 46 (C.P.1910) (denying specific performance to seller because of his agent's misrepresentations, even though seller was unaware of misstatements).

5. Because the party seeking specific performance in this case is an individual, we need not consider the nature of the evidence that might be required to show that an organization should be denied specific performance because it knew of

inequitable conduct by its agent. Nor, because the Seller has not raised it, do we consider the issue of whether Buyer may have ratified Harrison's inequitable acts. *See McMahon v. Spitzer*, 29 Ohio App. 44, 163 N.E. 37 (1928) (denying claim for specific performance of contract induced by misrepresentation; although principal did not know of his agent's representations, he sought to benefit from them).

mand to the superior court for further proceedings. We deny Queiroz's request for attorney's fees on appeal without prejudice to Queiroz seeking an award of those fees from the superior court at the conclusion of the litigation. We grant Queiroz's request for costs upon his compliance with Arizona Rule of Civil Appellate Procedure 21.

CONCURRING: PATRICK IRVINE, Acting Presiding Judge and NORMAN J. DAVIS, Judge.[6]